Good morning, and may it please the court. My name is Cal Chipchase. I represent the defendants, which I'll refer to together as Kapilina. With me at table are Lisa Schwarzfeger and Doreen Matsuoka. Your Honors, this case arises in an unusual procedural posture. That is, or unusual factual posture, I guess I should say. And that is that here, the product that allegedly caused the harm was put into the stream of commerce and rendered defective by the government, not by a private actor. In the typical federal officer removal case, the private actor manufactures a product pursuant to government specifications and passes it up the stream to the government, after which it causes some harm. Here, there's no allegation that Kapilina manufactured the product or rendered it defective. Instead, the allegation is the government developed the product, rendered it defective, and put it into the stream of commerce. Kapilina is said to be liable solely because it was part of that stream of commerce. Now, while we find ourselves on different points in the commerce stream, one thread connects us to all of those other cases in which the court has found federal officer removal to be appropriate. That thread is that in all the cases, the private actor is alleged to be liable for some action that the government took. Do you have a federal defense? Yes, Your Honor. And what is that federal defense? There are two federal defenses. The first is government contractors defense. The second is derivative sovereignty. And how are they government contractors? So the government contractors defense comes from the test in Boyle, which was developed under the FTCA's exception for discretionary actions by the federal government. Under that test, ordinarily, the contractor produces a product pursuant to some precise specifications. In that case, I think it was an airplane. Yeah, an airplane or Agent Orange or boilers in the case of asbestos cases like Leight and Isakson. The Isakson, rather, Agent Orange case. Here, far more than government specifications that the contractor followed, the government is alleged actually to have developed the product itself and itself put that product in the stream of commerce and itself made that product defective. But I think that means it takes you out of the federal contractor defense. Not at all, Your Honor. It's entirely consistent with the basis of the federal contractors defense, which again is the FTCA. So what did your client do that was required by a federal contract? So there's two federal contracts, the fleece and the water agreement. What my client did, as required by those agreements, which we read together, deliver water to the plaintiffs in this case. Now, wait a minute. Did the contract with the government require them to deliver water or did the contract with the government allow them to get water? It did both, Your Honor. Remember, there are two contracts here. The district court focused only on one in both cases. In both cases, the district court correctly recognized that Coppolina, under the utility agreement, is required to purchase and receive the government's water at the delivery point. The delivery point, as stated in the contract, are the meters on the lateral lines. Those are the meters that register use. Those meters start ticking when the users start using. The users here are the residents. And in that agreement, that water agreement, it expressly recognizes and cites the lease in several respects. One, the water agreement term is tied to the lease term. It ends when the lease ends. Two, the water agreement requires Coppolina only to use the water on those premises. Three, the water agreement or the utility agreement expressly contemplates that the water will be used for the tenants in two ways. One, it prohibits Coppolina from reselling that water. Two, it directs that Coppolina may only recover from the tenants in the leased premises its cost of delivering that water. The third connection, the final connection, I should say, to the lease is that that agreement expressly requires Coppolina to follow all Navy directions and instructions. That includes the lease agreement. The lease agreement was entered into pursuant to a unique federal statute. This is not the ordinary private party or public-private venture statute. This is a statute specific to Fort Island. Under that statute, 10 U.S.C. 2814, the Secretary of the Navy was congressionally authorized to enter into leases only if those leases furthered the purpose of the section. The purpose of this section is the development of Fort Island in a manner that is compatible with the mission of the Navy. That finding or that purpose is then reflected in the lease, which in the first whereas clause finds that this lease will further the purpose of 28 or 10 U.S.C. Section 2814. There are three basic requirements for you to be protected by the order to get the removal. The second one is there must be a causal nexus between your actions taken to pursuant to a federal officer's action. Now, what actions of your client were taken pursuant to? Now, pursuant to, I read that as caused by. That is to say, the federal officer directs and your client then does something. How does your client fit within that? Certainly, Your Honor. So, as this court explained in Goncalves, what that really means is because of. Does the plaintiff seek to hold the defendant liable? As I read it, it is taken at the direction of. So, the court has, if you're talking about the acting under element rather than the causal nexus portion of it, the court has described acting under as facilitating or assisting the government officer with its duties. It has described it as accepting subjection, guidance, or control. Guidance, assisting, facilitating, all different concepts from merely a. And what happens here is the feds are delivering water, period. That's not what happens here, period, Your Honor. What happens here is that under the two agreements, Kapilina, in the lease agreement, has an obligation, is taking this lease in furtherance of Section 2814. The purposes of that. That's the federal direction from Congress to the Navy. Only lease this land if it furthers this purpose. And the contracts at issue are deliverance of water, correct? Two contracts at issue, Your Honor. The lease and the water agreement. As I said, the water agreement only exists because of the lease. The lease specifically places on Kapilina the obligation to provide all utilities and to pay for those utilities. But it didn't require that they buy the water from the Navy. The lease did not. The water agreement does. So in terms of what they were required to do by the lease, there was no requirement that they take water from the Navy. Correct, Your Honor. They could have taken it from a private source. Practically, no. But under the lease terms, legally, yes. Now what is in the record that says practically no? That the Navy and the lease controls are accepted from the lease all of the infrastructure, all of the utility infrastructure on the premises. So if you look at what the lease demises, it excludes from the demise all utility infrastructure, including all water lines. So you're telling me that while they had the legal right to get water elsewhere, as a matter of practical fact, they simply could not have done so? That's correct. And what do we have in the record that supports that conclusion? The lease, which excludes... No, you're talking about practicalities now. I'm talking about... The lease says they can get water from a private source. You're saying that as a matter of practical fact, they could not. So what do we know that tells me that that's true? The lease. No, no. I just said the lease does not say that. The lease says they can take water from the Navy, or they can take them a practical source. And as I understand what you're saying is, as a matter of practical fact, they could not take it from a private source. Is that what you're saying, or are you saying something different? If I may, Your Honor, there's two responses to that. The first is that in one provision, the utility provision, it recognizes that we have the right to source water from something other than the Navy. Okay. Correct. In the demise of the lease, the lease, the part that sets out what we actually own and control, it excludes from the demise all utilities, including all water lines. So the lease both creates the right and the practical impossibility to source it from other places. But the second point that I would say, Your Honor, is that all of that is beside the point. The point is not whether we could have sourced water from some other place. The point is that we did source water from the Navy. And as both district courts recognized, once we entered into that water agreement or the utility agreement, we had the separate obligation to purchase and receive the Navy's water at the delivery point. As I said, that delivery point, under the terms of the utility agreement, is the meters on the lateral line where the uses are registered. So the question under the Goncalves, because of examination, is whether we are sought to be held liable by the plaintiffs for some action that we took because of the federal direction, that guidance, that assistance, that facilitation of the government duty. The totality of our relationship with the government is reflected in the lease and in the water agreement. The totality of that relationship is to lease these premises, limited to residential uses expressly in the lease, required to provide utilities expressly in the lease, provide water as directly contemplated in the water agreement, to the point of regulating what we can charge tenants, not a resale, recover your costs, to lease this housing, including the provision of utilities, which under the utility agreement included the water. Now, we have focused in that relationship on one claim, principally the strict products liability claim. We focus on one claim because, as this Court made clear in De Fiore and the Second Circuit has made clear in Savoy and other circuits have expressed, as long as one claim meets the test for removability, all the claims may be removed. Here, that one claim asserts liability for the delivery of the government's product as part of the chain of commerce that the government started. That takes us out of situations like Lake, where there were merely ancillary obligations like who could enter the premises. But the source of the asserted liability was the failure to warn because of pesticides. Nothing about who could enter the premises had to do with whether they had an obligation to warn because of pesticides. It takes us out of cases like Cedars-Sinai, where there was no federal contractual relationship. Instead, it was detailed regulation that the defendant sought to remove on. The same was true of the Supreme Court in Watson. There was no direct contractual relationship. We are much more like the court, or the situation in Goncalves, where that defendant was merely an administrator of a federal health care plan. As part of that administration, that private provider had the right to pursue subrogation and the obligation to pursue subrogation of claims where reasonable. So the discretion to determine whether they are reasonable, the discretion to determine when to file them, who to use, how to do it. None of that mattered for the causal nexus we're acting under in Goncalves. Instead, what mattered was the defendant in that case was sought to be held liable in state court because of the filing of a subrogation lien that the defendant or the plaintiff there sought to have expunged. On that basis, the administrator in Goncalves was able to remove the case. He was able to remove the case because, as Goncalves explains, he was sought to be held liable for some action that he took under federal direction. The same is true here. We're sought to be held liable because in the totality of our agreements with the government, we had an obligation to provide residential housing, we had an obligation to provide utilities. We had an obligation to purchase and receive this water at the meters that registered the tenant's use, and an obligation not to charge them more than their cost. Nothing more is required to meet that first element of removability acting under a federal officer that causes or a causal nexus to the claims that are made. You know, you can help me by going over again, because I'm not sure I quite understood you, why you are not able to purchase private water. I didn't, you said something and I heard it, but I didn't quite understand it. Certainly, certainly my fault, your honor. Well, I'm not sure it is, it may be mine, but anyway, help me out here. I'll try to help you out all the same. So, the lease, if you look at the demise and the lease. The demise? What do you mean by the demise? When a lease demises, it sets out what the tenant is taking. Right, so you want to give us the ER site? Yes, happy to. So, if you look at ER 147, the section titled demise under property specific terms and conditions. That section excludes from the property that's being demised all utilities, including all water lines. The second point that I made, your honor, so that is the source. That explains the government continues to own and control all of the water lines. The second- But owning the water lines doesn't tell you what can go through the lines. Absolutely, your honor, and that's why I said it's a red herring. It's no more relevant here than it was relevant in Goncalves who made the call or the decision to file the subrogation, or how it was physically done. Which computer, which notepads, which filing. No more relevant here than it was there. No more relevant here- I understand, okay, irrelevant. Now, tell me why you can't buy private water even though the lease says you can. Because the Navy continues to control all the lines that would have supplied that water. But I thought we just understood that those are just the lines and that the lines are capable of accepting water that's not from the Navy. There's nothing in the lease that, while the Navy controls all of the lines, controls all of the connections in them, there's nothing in the demise that allows or gives control to those lines to Coppelina. But I don't want to be overly distracted by this point because it's entirely beside the point. It's no more relevant than who purchased the asbestos in late. Whether it's relevant or not, I just want to understand factually. Absolutely. If your clients wanted to purchase private water, could they have done so? No. Why not? Because they don't control any of the lines under the demise that would have supplied the water. So you're saying that not only does the Navy own the lines, you're saying the Navy would not permit private water to go through the lines? The Navy, in order to install your own lines, requires approval of specific plans and detailed specifications. Under that approach, if we had in that or in- But that's not the approach Judge Fletcher asked you about. Right, and so- He wasn't asking about installation of new lines. I understand. And I suppose what I'm suggesting to the court is that it would take that effort to install new lines in order to have a hookup to a different water system other than the joint Pearl Harbor base water system. That effort could have been engaged in with approval from the Navy of detailed plans and specifications. That is absolutely set out clearly in the lease. So it was your choice of- So it was the choice of your client to take Navy water rather than private water? Yes, Your Honor. As I said, as a practical matter, because the Navy controls everything and we would have had to install new lines- Well, now new lines from where? That is to say, the lines that go to the actual apartments, probably not. The Navy continued to control all of those lines as well. And they would not have allowed you to hook up private water to go through those lines? There's no evidence in the record that there's any means to hook up other lines to the Navy's property because we don't lease it. We don't control it. The Navy retains control over that. So it's not an interest or a right that Coppelina took on under the lease. Even if it were, it wouldn't matter because there's no allegation that there was some failure in those lines, the maintenance or control of them or repair of them, that led to the plaintiff's injury. Even if we could have obtained water from other sources, we did obtain water from the Navy. And it is true in every single federal contractor case, that the contractor did not have to enter into the contract. The contractor could have passed on it, could have not bid on it, could have done something else. I'm not interested in a contract you didn't enter into. I'm interested in the contract you did enter into. Exactly. Because I read that contract, it allowed you to get private water. And what I'm saying, Your Honor, is that even if that, that is stated in section 19. True. But the fact that we went into a second contract with the Navy for the utility system, added to our federal burdens and obligations. And so you look at both contracts together because the totality of them represent our contractual relationship with the Navy. And the totality of them exist under 10 U.S.C. Section 2814. Assuming that you're right, that as a practical matter, you had to accept water from the Navy. Why isn't this just a case where it's liability over? You're sued, you sue the Navy. In the event that I'm liable, well, the Navy's liable because they did it. Why does this turn you into a government contractor? So, I see I'm short, I'm running short on time. This is a question you need to answer. Absolutely, Your Honor. I'm just, just prefacing, and I'll, I'll try to move on. You're fine. The, the government contractor defense contemplates that you voluntarily enter into a contract. Contemplates the government specification of the product and the manufacturer of it. The defense applies here because the government supplied the product. And so, it is far beyond a mere specification. It is actually the government's product that they seek to hold us liable for. Not in the strict products liability count, any act or omission of copulina. As for the purpose, which gets directly to your question of the federal officer removal statute, it is in part to test federal defenses in federal court, including naming federal actors. We were sued in state court. We cannot bring the Navy into state court. We cannot test our federal defenses in state court in two important respects. One, is this court has held, beginning with the Nielsen case. The government contractor's defense in this circuit is ordinarily limited to persons supplying military equipment. The, this court has made clear in De Fiori and other cases that the standard for colorability is not a rule 12B6 standard, it's a frivolous standard. Frivolous means that it's foreclosed by US Supreme Court precedent or it's brought in bad faith, such as solely to obtain removal. Here, to test that defense in federal court, we have to be able to ask the panel en banc to overturn the earlier panel decisions, or to ask the US Supreme Court to resolve a circuit split between this circuit and every other circuit to consider the issue. Every other circuit to consider government contractors has not limited to the military context. And even in those cases where the circuit courts themselves have not considered it, the district courts to have considered it have not limited it to government contractors. We have to test that defense and we have to be able to sue the Navy. We have to be able to be in federal court to do either. I, I used my time, Your Honor. I'll, I'll step away from the podium unless there are further questions. I don't think there are. Thank you. May, may I ask for just two minutes for rebuttal? When you come back, we'll put two minutes on the clock. Very good. Thank you. May it please the court, I'm Jim Bickerton for the plaintiffs this morning. The, the part that was skipped over in counsel's description of this whole totality of contracts is that actually the utility agreement supersedes the lease to a certain extent. The utility agreement specifically says, Kapilina shall have control over the system after the delivery point. That's expressed in the utility agreement, in the lease. Where's the delivery point? I'm sorry? And where's the delivery point? The delivery point is specified, it's on page 137 of the ER. And it is specified, I believe, and this is how I read it, as the Iroquois Point housing water. Because there are two, there are two housing areas described, I believe, geographically. The, what we call Kapilina is on Iroquois Point. But it's possible it's also Pu'uloa, because there's a beach park right there called Pu'uloa Beach Park. It's not clear. On page 137, it says that the delivery point for Iroquois Point shall be delivered by the Navy to Kapilina up to the CP meters. That's the cop, CP is the defendant. Up to the CP meters located on the waterline laterals. CP is responsible to make connections to the Navy water system. CP is responsible for reading and maintaining the lateral meters. And billing will be based on the readings from the lateral meters. So there's a point at which CP becomes the owner or at least the operator of the system. And in charge for maintenance is the way I understood that, for the system. Yes, and but the utility, this is just an addendum or an exhibit to the utility agreement that specifies the term delivery point which is used in the utility agreement itself. The utility agreement itself goes beyond just maintaining, it says operating, I believe. Let me point the court to that provision, if I may. And that's at page one. Exhibit one starts at 131. And that's the agreement that specifically says that they're responsible. Says the delivery, on the second page of it, 132, the delivery point represents the delineation of responsibility between the government and the purchaser. Parties are responsible for the maintenance, repair, and operation of the utility system on their respective side of the delineated delivery point. That's a little different from the lease. The lease said, as Mr. Chipchase points out, in the demise, it specifically reserved the whole water system as being not leased to them. That doesn't mean they're not being allowed to use it. It means that they don't have it as property that they can claim a 100 year lease or 99 year lease or whatever that is. It's our understanding, and again, the record is devoid on this particular question of precisely where delivery points are. And it is their burden. They're the ones that are asserting federal jurisdiction. This case was filed in state court. It's their burden to present that factual record to you of exactly how the water can be controlled and where the delivery points are. It's our understanding that there are numerous points where Coppelina could shut off water for everyone. But even if that isn't true, there is definitely a point at each meter for each home where they can turn it off. And according to, it's very clear in the utility- They have to supply water. They have to supply water for the tenants. Well, this is, Red Hill was a temporary problem. It lasted a total of four months. It's entirely possible to bring in water trucks and hook them up to the meters that you control. It might be expensive, it might be inconvenient, but it beats delivering water that's non-potable that's laced with jet fuel into people's homes. So that's the real, what the case is about. They had the ability to control, nothing required them, excuse me, nothing required them to deliver tainted water, nothing required them to accept the Navy. In fact, they've got this utility agreement with the Navy. It says in it, potable water, that's what the contract is for. As soon as they realize that what is coming through the Navy's line from the main Red Hill area is non-potable water, they have every right under the contract to say, no, thank you, we're turning off this particular faucet. We'll find some water somewhere else, but we're not putting this water into people's homes. Absolutely, not one thing requires them to say, we must accept this and we must deliver it, which is basically what Mr. Chip Chase's argument is, to try to squeeze himself into this square peg into the round hole of the federal officer jurisdiction. So that is, I think, factually the important thing to understand, is they did have control. The other part of their- He said practical ability. He's really arguing practical ability. It wasn't practical for them to purchase the water somewhere else. And you just walked through, one hypothetical was to buy water in trucks and deliver it home to home. Are there other, is there anything else in the record that would help us at this stage to know that? I think that the record, well, basic contract principles would also help you. Which is, he wants to read the lease as creating an impossibility from the get go. In other words, you can totally buy your water anywhere, ha ha, but you actually can't. Right. Because we've kept the way that you can do that. It's a very basic rule of commercial litigation, we all know, which is you don't apply a construction that is not commercially reasonable if there's any other possible reasonable construction of that language. People don't contract for impossibility. So what do we know from the record in front of us as to whether it would have been feasible from the get go, simply not to get Navy water? We don't know anything about to get water other than the Navy water. Correct, on a temporary basis. As far as I can tell from the record, I think everyone in this room knows a lot practically about the way Honolulu is set out and where sub city connected subdivisions may be, but it's not in this record and it's their burden to show you. They have to prove that it's not possible for them, that they had to do this, that they were bound to do this, and they haven't shown you that. We believe that even on the record that they presented, we can show you that it was possible, even on this record, although it's devoid one way or the other of exactly where they might hook into the city system or to another supplier system. But you could take a water truck to the master main as well, like you don't have to take a water truck to each house. If you have a faucet- I'm not talking about water trucks, I'm talking about setting it up as a permanent proposition. Well, there's certainly other regions within a fairly close distance that have city water. And how practical it is to hook that up or how expensive, why they chose, these leases were entered into in 2003. This utility agreement where they decided they were going to buy the water from the Navy was 2012. What did they do between 2003, 2012? I suspect they were busy renovating and rebuilding these properties. I don't know if they were actually being leased out or not. We just don't know that from the record. So I think that the causal connection, it has two parts. One is you have to be sued because of something that you did. And then that something that you did has to be under the subjection, guidance, or control of a federal officer. And they don't really have either one. They are being sued for something that they did, but it isn't something that they had to do or was controlled or guided or under the subjection of any federal officer. And so they're building a bridge across the river and they're missing that arch stone in the middle, it just isn't there. And they can wave their hands all they want, but nobody required them, once it was known that the water was tainted, nobody required them to deliver that water into people's homes. They absolutely had no compulsion to do it. The federal government is not the designer and manufacturer of this product, as he likes to say. This chemical leached into the water system because of the basaltic formations of this island, the way the island is set up and the way the original system was set up. The federal government certainly didn't want to do this, but it happened. And so the federal government is simply upstream in this problem. Our clients have no privity with the federal government. They can't sue the federal government under their lease for failure to deliver potable water to them. They do have privity with their landlord, and that's who they get to sue. Their last area that they really like to talk about is, well, we're being sued for these things that we have absolutely no fault. There's no fault for these. Strict liability is one, and the other one is trespass. That's actually not true. If you read the cases, the concept they're really talking about is called absolute fault. And there's almost no tort that has absolute fault that I can think of. But where you have absolute fault is an insurer. An insurer has to pay whether they're involved or not, whether they know anything about it or not. Whether they were at the scene or not, they must pay. Here, we have two torts. Strict liability, there is still fault. You must place a defective product into the stream of commerce. It may not be negligence. I think they're conflating the concept of negligence and fault. But you can have fault in other ways. You can have intentional fault. You can have negligent fault. You can have strict liability fault, which is you put a defective product into the stream of commerce. You didn't have to do that. You didn't have to be in commerce. You didn't have to have a defective product. Same thing with trespass. If a federal officer had pushed someone onto the property, sure. You're acting under their dominion or subjection. You can't help it. You didn't voluntarily or willingly act. That's not trespass. But trespass, all it requires is an intentional invasion. You don't have to know that your invasion is wrongful even. You just have to enter someone's property or put something on their property. If it turns out it's something that's not supposed to be there, you're liable for trespass. The mental state isn't necessarily a very difficult one to meet, but it is, it does exist. It has to be a voluntary act. So when they say it's without fault, that's not true. Everything that was done here was done as a voluntary act. Thank you for that. Do you have questions for this lawyer? Thank you, if there are no- I wanted to make sure that people were getting their word in edgewise if they had any questions for you. I wasn't trying to get involved. Sure, sorry about that. I talk a little fast. No, no, no, you're fine. You're great. I just wanted to make sure and I couldn't tell, but I think we don't. If you want to, you have more time on the clock. I wasn't trying to talk you out of anything, but. Well, I'll just, if I may just take a second to just look at my notes, make sure I did cover the points that I have. No, I think I covered everything that I wanted to talk about. Thank you very much for your time this morning. Thank you for your careful preparation and your argument. We appreciate it. Counsel, we're going to put two minutes on the clock as promised. Absolutely, Your Honor. I didn't realize that they were splitting their time, and Mr. If they are, it's not any other argument. No, no, Your Honor. Kyle Smith and counsel on the left go, but I defer to, it's basically the same issues, and I assume you'd rather hear from one of us than both of us, so thank you. That's fine. I didn't have any indication that you're splitting your time. No, no. Okay. Typically, Madam Clerk would have called that to our attention, so. Okay, that's fine then. Two minutes. Very good, Your Honor. Thank you, and I appreciate the indulgence. We don't have to show that we couldn't have bought it elsewhere, either from the beginning or at any point in the actions that were taken by the federal government to contaminate what they call a product. Those are their words, not mine. They allege that the water is a product and that the government contaminated it. We don't have to show it, that we couldn't do it elsewhere, because it is not necessary that you're left with no options under federal contractor's defense or under the federal officer removal statute. What is necessary, in the words of Don Calves, is to show that you are involved in an effort to assist or help carry out the actions of a federal superior. The actions of the federal superior are through the Navy in section 10, Title 10, Section 2814 of the US Code, to lease this property. The federal officer removal statute requires showing as a condition of removal that the feds told somebody to do something and they did it. What did the feds tell you to do? The feds, through the lease agreement and the water agreement, told us to lease these properties for residential uses and to just correct the timeline. This was an assignment of an already existing lease. Once we took the assignment, we entered into a new water agreement. There's a prior water agreement that is specifically referenced in the lease that was assigned to Coppelina. But it seems to me your argument really depends upon us reading those two contracts as one. And I think you've been pretty clear about that, actually, in your argument today. Correct, Your Honor. That is absolutely correct. And so, what I will leave us with then in my 27 seconds is that here, although we end up in an unusual context in the sense that it's the government's product. We end up in the same context as all the cases that have found removal. Our actions are inextricably tied to the federal government's actions. As set out in Lozano court, in both complaints actually, this was an environmental and humanitarian disaster. That's what they allege. Thousands of people have sued the Navy and federal court for personal injuries. We are linked to that through the delivery of the Navy's water to the same individuals. To test our defenses, to make the Navy a part of our case, we need to be in federal court as well. Thank you for your time, Your Honors. Thank you. Thank you all. We'll take that case under advisement. That completes our calendar for today and for the week. So we'll stand in recess. Thank you.
judges: FLETCHER, CHRISTEN, DESAI